*LAKE SHORE & MICHIGAN SOUTHERN RAILWAY CO. v. JACOB GEIGER.

1. DUTY TO LOOK AND LISTEN NOT EXCUSED BY OBSTRUCTION, WHEN TRAIN KNOWN TO BE DUE.

A person in command of the ordinary human faculties, driving along a public highway, on coming to a known railroad crossing where trains are, to his knowledge, about due to pass, is guilty of negligence if he attempts to cross the railroad tracks without first stopping to listen and without looking for approaching trains, when, by looking from his vehicle, he could have seen an approaching train, at such a distance from the track that by stopping he could avoid danger, although the railway company had for a long time kept a flagman at said crossing to warn travelers of passing trains, if, on the occasion in question, it was about or a few minutes before the time the flagman usually left his post for the night, and his office was seen to be closed, and he not in sight, and although neither of the signals of the approach of the train, required by statute, was given.

* This decision as to duty, on approaching railway crossing, to look and listen, is cited as authority in L. S. & M S. Ry. Co. v. Gaffney, 6 Circ. Dec., 94, 100; the rule is followed but the case distinguished in Schausten v. St. Ry. Co., 7 Circ. Dec., 389, 392; it is also followed in B. & O. Ry Co. v. McPeek, 8 Circ. Dec., 742, 751.

**2. MUST NOT ATTEMPT TO DRIVE OVER WHEN APPROACHING TRAIN IS SEEN.**

At such crossing and at such time, and under the circumstances above recited, such traveler actually sees the approaching train, and when if he had stopped, he would have been secure from danger, and he does not stop, but attempts to drive over said crossing ahead of the train, and is hit and injured by the train at the crossing, he cannot recover damages from the railway company for such injury.

ERROR to the Court of Common Pleas of Wood county.

BENTLEY, J.,

This is an action brought to reverse the judgment obtained by Jacob Geiger against The Lake Shore & Michigan Southern Railway Co. in the court of common pleas of this county, for personal injuries received by him at the crossing of the railroad and a certain highway along which Mr. Geiger was traveling at the time of his injury.

This is the second judgment which Mr. Geiger has obtained against the railroad company upon the same cause of action; his former judgment having been reversed by this court for the reason, as the court then thought, that it was not sustained by sufficient evidence, and was contrary to law.

The cause having been remanded by this court to the court of common pleas for a new trial, the parties again tried the case to a jury, and the same facts were proven then that were proven upon the former trial. It is claimed, however, in behalf of Mr. Geiger, that the present record differs materially from the record which came under the review of this court before; that witnesses testified in this case whose testimony was not heard before, and certain circumstances are shown which were not shown before, and also that there is an absence of certain proof in this case which was in the former record; notably the testimony of the plaintiff below himself. That is; that his testimony is not in this record, but was in the former record. There was a statement of counsel upon hearing on this trial, and certain reasons were given why Mr. Geiger did not testify on this last hearing, but the reasons appear simply upon a statement of counsel, and do not appear on the record, except so far as witnesses have testified regarding the physical condition of Mr. Geiger. So, in short, the question now presented, is whether this record differs so materially from the other record as to indicate the propriety of a different judgment from that rendered before; or perhaps, more strictly, whether this record exhibits error that ought to reverse the judgment and set aside the verdict whatever may have been done with the former proceeding.

The judge delivering the opinion in the former case recited all the circumstances and manner of the accident, etc., and I shall not attempt now to go over it in detail. I will simply state briefly some general outlines of the facts in the case so that what I have to say may be understood. The scene of this accident was in the city of Toledo on a highway known as East Broadway, and at a point where this railroad crosses at an angle of forty-five degrees, the highway at the place in question running northwesterly and southeasterly. The plaintiff was going south on this road driving a pair of horses attached to an ordinary lumber wagon with a board for a seat, on which the plaintiff and a companion were sitting. The train which caused the injury was coming from an easterly direction, and the plaintiff had driven across the track. His horses and a portion of the wagon had gotten across the track, when the engine coming from the east struck the hind part of the wagon and caused the injury. The horses seem to have gone over without injury with the fore wheels of the wagon, but the other portion of the wagon was torn in pieces, and the plaintiff and his companion seriously injured.

The negligence claimed by the plaintiff was in this: that the company had at this point several tracks lying substantially parallel with each other; the tracks to the south, called the main tracks, and two side tracks north of them: the most southern track being used for west bound trains, for the use of such trains as that which caused the injury—the next track being wholly for east

**bound** trains, and the two sidings north of that for storing cars, and the ordinary **use** of side-tracks as used by railroads.

It is claimed that the company negligently and improperly, prior to the accident, had caused a lot of box cars to be placed on these sidings, and that they came not only in the legal limits of the public highway from the tracks lying easterly from the highway, but that they extended, on one track at least, on to the planking forming the ordinary crossing where teams were driven along the road, and that on the other side, while not coming quite so much to the road, yet they were within the legal limit of the highway, and on the traveled part of it. That the company placed cars in that situation which cut off the view of trains coming from the east, so that persons coming along were unable to see the approaching train; and it is also claimed that various other obstructions hindered the view in that direction. It is claimed that this was negligence.

It is also claimed that the train which caused this injury was passing the crossing at a dangerous rate of speed, and one that directly violated the provisions of an ordinance of the city which prescribed that a train should run over that crossing at a maximum speed of six and not less than three miles an hour, and that in approaching that crossing at such a rate of speed as it did, the company was guilty of negligence.

It is also claimed that the company was negligent in this: that having recognized this crossing as a dangerous crossing, and one that should be guarded **by** flagmen who might keep watch of trains and warn the public of their **ap-proach**, they had provided such a flagman to be kept there, and that his custom was to come on in the morning about six o'clock, and to stay there until six o'clock in the evening, and until two passenger trains which leave Toledo between five and six o'clock had passed this point; and that this flagman having been stationed there for quite a length of time, the public had a right to rely on his being there, and the plaintiff had the right so to rely when he attempted to pass there; but that the flagman had left his post before the time of this accident, some minutes, and was not there to warn the plaintiff, and the plaintiff not seeing him and having the right to suppose that if he was not there to warn him off, it was proper to cross; that plaintiff might rightfully attempt to pass over, and that he did so, and the company was thus negligent in the omission of this flagman at that point. Perhaps there are some other matters alleged as negligence, but these are the main matters. There is a further allegation in the petition that this train approached this crossing without giving the statutory signals, and that the company was thus liable for not giving those signals.

On the other hand, the company denies all these various matters and charges of negligence, and sets up affirmatively that the injury was caused proximately and directly by the negligence of the plaintiff himself in attempting to cross the track under the circumstances.

If this verdict is improper, it is by reason of the testimony and evidence in the case failing to properly support it. There are some objections made in the record as to the admission of testimony, and the ruling of the court in the progress of the trial, but we are unable to see that any such exceptions are properly taken. The situation, the manner of the approach of this train to the crossing, and all of the facts were fully stated, as I have said, by the judge pronouncing the opinion of this court before, and it was stated at that time that from the evdience that this court was unable to say that the jury were clearly wrong in determining that the company was guilty of negligence; but the judgment was reversed before wholly upon the ground of the contributory negligence of the plaintiff himself, and this is the matter to be inquired of here more particularly. We would say in this case as in that: we should not be clear that the jury might not have been warranted in finding that the company was negligent in some of the particulars charged here.

Now, was the plaintiff negligent in such a manner as should cut him off in his right to obtain a verdict?

There is some testimony that is conflicting in regard to the position of these box cars which hid the view, and just how far they extended out into the highway, but we think the jury were warranted in coming to the conclusion that they did, in fact, project—some of them—into the legal limits of the highway, and that they did come close up to the actual crossing properly for the passage of wagons. It seems clear that the jury may have found also, that it would be very difficult for the plaintiff coming along that road from the north, S. 6, p. 46, after he had passed these box cars standing in the road; and the question is now, whether he could at any point before he got so far down the track that he could not recede, whether he could get a view of this train approaching, or could have obtained a view with such diligence as ought to have been required of him to prevent the accident.

There is a conflict of testimony regarding the giving of these signals. Of course, that bears in two directions. It bears upon the question of actual negligence of the company, and upon the question of the plaintiff's contributory negligence in failing to hear them if they were given, or relying on their being given. Quite a number of witnesses testified that the signals were not given; that they heard none. A large number of witnesses in behalf of the railroad company testified they were given in fact, and that they heard them, and they were properly given. I think there were some nine witnesses for the railroad company who testified on this subject. Some speaking of both signals, and some of the whistles and not noticing in regard to the ringing of the bell.

Cases are cited which deal with the question of conflict of testimony where one witness testifies that he did not hear a sound, and another testifies that he did hear it, or that he himself gave it, and quite a number of courts have held that the affirmative testimony is more valuable than the negative testimony. That is, where a person testified he heard a signal, his testimony is of more weight than the man who testified he did not hear it. That the testimony of the man who says he did not hear it is not necessarily in conflict with the testimony of the man who says he did hear it; because the signal may have been sounded and not attracted the attention of one, and may have attracted the attention of the other. We think in this case that the signals were given—at least that the testimony that the whistle was sounded, is of more weight than the negative testimony that it was not sounded. However that may be, I will look for a moment into the situation of the party as he came up to the track without regard to the whistling. Now, his witnesses say (he did not testify himself) that the flagman was not there. The testimony of his witnesses was that the door of the shanty of the flagman was shut, and there was no appearance of a flagman there at all; and it is argued that he had the right to think the way clear; that if there was no danger, the watchman would not appear, and in his absence he was to suppose there was no danger.

There is testimony showing that this plaintiff had crossed there a number of times, and there is no question but that he was aware of the crossing and the general surroundings. Whether he knew the custom of the flagman does not appear directly. If he placed any reliance upon it, it must be gathered from the general circumstances of the case, and not from his testimony. It was about the time that the flagman usually left. The attempt is on the one side to show that it was after the time when the flagman frequently left, and on the part of the plaintiff that it was a few minutes before the time that the flagman usually left; but there seems to be no question but that it was a few minutes one way or the other from this time; that the flagman usually left about this time, or a few minutes after this time, and now the question arises in the mind, how far a person would have the right—crossing a dangerous crossing and not seeing a flagman there at all, and seeing the door of his house or shanty closed, and at least being chargeable with the knowledge that it was within a very few minutes of the time that he generally left,—to rely on the fact that the flagman not being there the crossing was safe.

We think an ordinarily prudent man would not rely upon the absence of the flagman, and would question whether he had not gone for the night. A cautious man under circumstances of that kind would not rely very much on the absence of the flagman, and would have very little right to rely on it.

Now as to seeing the train. It is proven, we think, conclusively, that when the plaintiff approached this crossing, he could see these box cars coming up pretty close to the road. He knew, of course, that they hid the main track, for a certain distance, from his view when he was in a certain situation. It was shown that there were trains passing there quite frequently, and trains about this time of the day; a train going east and a train going west, so that he would be chargeable with some knowledge that a train along about that time might be expected from either way. He came up to that crossing, and the box cars hindered him seeing a very great distance; he was in his wagon, and went right along and did not stop, and when he had passed the car—the last car that would hide his view, what was his duty? Should he have proceeded right along without looking, or should he have taken the precaution to look as soon as the way was clear; and if he was charged with the duty of looking at that time as soon as he got from out of the line of box cars, was he in such a situation that he ought to have stopped if he had seen the train, or was he excusable for driving along and not stopping?

The distance between the tracks and the distance of this last box car from the track upon which the west bound train was coming, all of these distances were fixed beyond all probability of substantial error. It is shown that as soon as he passed the car, if it was standing at the place where his witness testified—he could have plainly seen for a long distance a train coming, and his horses would have been sixteen to twenty-one feet from the track whereon the train was coming. Now, there is an engine coming, it is claimed at a pretty good speed; the heads of his horses are twenty-one feet from the track; it is so close that he proceeding and it proceeding, it struck his wagon before he got over. Now, if he had seen the train coming, to then have attempted to pass in front of the train would have been gross negligence; there is no question about that in our view; and if that is so, should he have seen the train? He does not testify here whether he saw it or not; but his companion, who was in a position where he could not see the train as quickly as the plaintiff, testified that he saw it when he was several yards away. His statement is, that they were too close to turn around and get out of the way. But he saw the train coming, and the plaintiff could have seen it for a long distance if he had looked at the time. Well, now, he either saw it and attempted to get over ahead of it, or else being chargeable with the duty of looking to see, he did not look and did not see. He whipped up his horses at a certain point before he had gotten to the south main track; he "encouraged his horses," as one witness said, and as the other said, he "seemed to hurry them up, and whipped them with the lines or hit them with a whip." There is some evidence tending to show also that when the wagon was between these two lines of box cars, his companion called his attention to the fact that he had better get out and look, and plaintiff then says, that somebody said "it is all right and go ahead," and that the plaintiff did urge his horses. The companion of the plaintiff on the wagon testified that while plaintiff said that, he, the witness, did not hear anybody say "it is all right, go ahead;" and did not see anyone.

Now, taking all of these circumstances into consideration, it seems to us that the plaintiff was beyond all question guilty of negligence in attempting to cross the railroad track at that point at that time, and in that manner. That he neglected his plain duty to wait and to take an observation, and that if it was not his duty when he knew that he could not see the track on account of the box cars to allow his companion to get out, it certainly and clearly was his duty as soon as he passed beyond the box cars to look, and stop his team and ascertain if there was any appearance of danger.

From all the circumstances of the case, we think he did look, and did see the train, and that he concluded he would whip up his horses, and attempt to get

over before the train got there, and that he made a miscalculation in his judgment, and that that judgment which he then exercised, he had no right to put to the test under such circumstances, and had no right to risk the chances of his getting over the track in front of a fast coming train.

The absence of the testimony of the plaintiff in this case, it seems to us, does not make this record so different from the former one as to make a different result proper. In fact he might testify to some things if he had been a witness, viz.: his knowledge of the flagman being there; his reliance upon the fact that the flagman did not appear to stop him, and his statement that he did not hear the sound of the approaching train, or those signals; he might have testified to those matters, but he has nothing of that kind in this record. But if he did, we think there would be no difference in the result to be reached; and thinking the rules of law require the same kind of judgment as was rendered before, and thinking that the plaintiff was clearly guilty of contributory negligence, we reverse the judgment and set aside the verdict, and render judgment against the defendant in error for costs.

*Hon. John M. Lemmon*, for plaintiff in errror.

*Dodge & Canary*,, for defendant in error. .